# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| DEALER COMPUTER SERVICES, INC., f/k/a FORD DEALER COMPUTER SERVICES, INC., Plaintiff, | § § § § § | |
| v. | § | CIVIL ACTION NO. H-08-2986 |
| O'CONNOR CHEVROLET, INC., Defendant. | § § § § | |

## **MEMORANDUM AND ORDER**

This case concerns Plaintiff Dealer Computer Services, Inc. f/k/a Ford Dealer Computer Services, Inc.'s ("DCS") attempt to compel arbitration against and the payment of arbitration fees by Defendant O'Connor Chevrolet, Inc. ("O'Connor"). Pending before the Court is DCS's Motion to Compel Arbitration and Payment of Arbitration Fees [Doc. # 1] ("DCS's Motion to Compel"). O'Connor has filed a Rule 12(b) Motion to Dismiss and Motion to Transfer Venue [Doc. # 5] ("O'Connor's Motion"), as supplemented by a First Supplemental Rule 12(b)(6) Motion to Dismiss and Motion to Transfer Venue [Doc. # 10] ("O'Connor's First Supplemental Motion") and a Second Supplemental Rule 12(b) Motion to Dismiss and Motion to Transfer Venue [Doc. # 20] ("O'Connor's Second Supplemental Motion").[1]  DCS has

---

[1] O'Connor has also filed a Supplement to its Second Supplemental Motion [Doc.

Responded to O'Connor's Motion [Doc. # 12] ("DCS's Response"), and has Responded to O'Connor's Second Supplemental Motion [Doc. # 23] ("DCS's Supplemental Response"). DCS has also filed an Amended Complaint [Doc. # 18]. Upon review of the parties' submissions, all pertinent matters of record, and applicable law, the Court concludes that O'Connor's Motion [Doc. # 5], as supplemented [Docs. # 10, # 20, # 22], should be **granted**.

## I.      FACTUAL BACKGROUND

O'Connor owns and operates a Chevrolet dealership in Alsip, Illinois. From 1993 until the present dispute, O'Connor contracted with DCS for DCS to provide, support, and maintain a dealership computer system (the "Agreement"). The Agreement contained a choice-of-law provision designating the law of the State of Michigan to govern the Agreement.[2] The Agreement also contained an arbitration clause providing that "all disputes, claims, controversies and other matters in question between the parties to this Agreement, arising out of, or relating to this Agreement, or to the breach thereof . . . shall be submitted to arbitration in Detroit, Michigan to

---

[1]   (...continued)
      # 22].

[2]   Agreement between Ford Dealer Computer Services, Inc. and Bob O'Connor Ford, Inc., Exh. 3 to DCS's Motion to Compel [Doc. # 1], § 18.C.

be arbitrated by a person agreed upon by the parties to the dispute."[3] The parties also agreed that the arbitration would be governed by the commercial arbitration rules of the American Arbitration Association ("AAA").[4]

The relevant facts and the contentions of the parties are intertwined with the facts and proceedings of several similar and/or related arbitral proceedings; therefore, a brief summary of these proceedings is essential to the Court's analysis. In November 2006, on the basis of a contract[5] to provide Randall Ford a dealership computer system, DCS filed a demand for arbitration with the AAA against Randall Ford, Inc. (the "Randall Arbitration"). On January 3, 2007, a group of dealers, including O'Connor, filed a class action arbitration demand against DCS with the AAA (the "Class Arbitration"). The following day, on January 4, 2007, DCS filed a demand for arbitration against O'Connor based on the arbitration provision contained in the DCS/O'Connor Agreement (the "O'Connor Arbitration").[6] In September 2007,

---

[3]   *Id.*, § 17.

[4]   *Id.*, § 17.D.

[5]   The Court understands this contract to be similar to the Agreement at issue in the present dispute.

[6]   To date, all proceedings in the O'Connor Arbitration have taken place telephonically. The final hearing, however, is scheduled to be held in or near Detroit, Michigan. The initial demand for arbitration was filed with the AAA case administration office in East Providence, Rhode Island. One of the arbitrators is located in California and one is located in Texas. The parties were unable to represent to the Court at the initial
(continued...)

in pleadings in the Class Arbitration, DCS argued that the Randall Arbitration had dominant jurisdiction over the claims of certain of the dealer-class members in the Class Arbitration.[7] On November 13, 2007, the dealers elected to nonsuit the Class Arbitration and sought to be added as parties to the Randall Arbitration.[8]

The O'Connor Arbitration progressed contemporaneously with the Randall Arbitration and the Class Arbitration.[9] At some point during the O'Connor Arbitration, the arbitration panel required the parties to advance certain arbitration fees and expenses. O'Connor has refused to pay these fees and, as a result, the O'Connor Arbitration was terminated by the AAA. On October 7, 2008, DCS filed the pending Motion to Compel, seeking to compel O'Connor to arbitrate in the O'Connor Arbitration. Specifically, DCS seeks an order compelling O'Connor to pay

---

[6] (...continued)
pretrial conference where the third arbitrator was located.

[7] *See* Reynolds' Motion to Dismiss Based on Dominant Jurisdiction, Exh. A to O'Connor's Motion [Doc. # 5].

[8] *See* Notice of Non-Suit, Withdrawal and Dismissal, Exh. C to O'Connor's Motion [Doc. # 5].

[9] It should be noted that, at the outset of the O'Connor Arbitration proceedings, O'Connor specifically objected to the O'Connor Arbitration panel's jurisdiction, arguing that the Class Arbitration had dominant jurisdiction over the dispute. *See* Respondent's Objection to Jurisdiction and Original Answer, Exh. B-5 to O'Connor's Motion [Doc. # 5].

its share of the O'Connor Arbitration fees so that the O'Connor Arbitration can be reinstated.

O'Connor moves to dismiss or transfer the case under several theories. First, O'Connor moves to dismiss under Rule 12(b)(1), arguing that the Court lacks subject matter jurisdiction. Second, O'Connor moves to dismiss under Rule 12(b)(2), arguing that the Court lacks personal jurisdiction over O'Connor. Third, O'Connor moves to dismiss pursuant to Rule 12(b)(6), arguing that DCS does not have standing to seek to compel arbitration because O'Connor is "currently participating in and paying for its share of the arbitration fees and expenses in [the Class Arbitration] with [DCS] based on the same contract and the same arbitration agreement" in issue in this case.[10] Fourth, O'Connor moves to dismiss under Rule 12(b)(3), arguing that this district is not the proper venue to hear DCS's Motion to Compel. Finally, and in the alternative, O'Connor argues the case should be transferred to the Eastern District of Michigan pursuant to 28 U.S.C. §§ 1404(a) and 1406. The Court reaches only the first two issues.

---

[10] O'Connor's Motion [Doc. # 5], at 3.

## II. ANALYSIS

### A. Rule 12(b)(1) Motion:  Amount in Controversy

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16, does not provide a basis for federal question jurisdiction under 28 U.S.C. § 1331.  *See Vaden v. Discover Bank*, 556 U.S. __, 129 S.Ct. 1262, 1271 (2009).  Rather, § 4 of the FAA provides that a district court may issue an order compelling arbitration only when the court would have jurisdiction over a claim in the underlying dispute.  The only basis for jurisdiction over DCS's underlying contract dispute in this case would be diversity jurisdiction.

At the initial pretrial conference, the Court requested additional briefing from both parties regarding whether the Court has diversity jurisdiction over DCS' Motion to Compel Arbitration.  O'Connor argues that there is insufficient evidence establishing diversity jurisdiction because DCS's "own documents reveal that the only amount actually in the dispute before this court is the amount of a requested AAA deposit in the sum of $16,354.20, which is far below the $75,000 minimum sum required for diversity jurisdiction."[11]  O'Connor's argument is unpersuasive.

A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Krim v.*

---

[11]  O'Connor's Second Supplemental Motion [Doc. # 20], ¶ 6.

*pcOrder.com, Inc.*, 402 F.3d 489, 494 (5th Cir. 2005) (citations omitted). In considering a challenge to subject matter jurisdiction, the district court is "free to weigh the evidence and resolve factual disputes in order to satisfy itself that it has the power to hear the case." *Id.* When the court's subject matter jurisdiction is challenged, the party asserting jurisdiction bears the burden of establishing it. *See, Castro v. U.S.*, 560 F.3d 381, 386 (5th Cir. 2009). A motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove a plausible set of facts that establish subject matter jurisdiction. *Id.* The Court must "take the well-pled factual allegations of the complaint as true and view them in the light most favorable to the plaintiff." *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2007).

As to jurisdictional attacks based on an insufficient "amount in controversy," Fifth Circuit authority is clear: "the amount in controversy in a motion to compel arbitration is the amount of the potential award in the underlying arbitration proceeding." *Webb v. Investacorp, Inc.*, 89 F.3d 252, 256 (5th Cir. 1996). This is consistent with more recent decisions in other Circuits. *See Advance Am. Servicing of Ark., Inc. v. McGinnis*, 526 F.3d 1170, 1175 (8th Cir. 2008); *Woodmen of World Life Ins. Soc'y v. Manganaro*, 342 F.3d 1213, 1218 (10th Cir. 2003); *Doctor's Assocs., Inc. v. Hamilton*, 150 F.3d 157, 161 (2d Cir. 1998) ("In the context of a

petition to compel arbitration, we have advised district courts to 'look through to the possible award resulting from the desired arbitration, since the petition to compel arbitration is only the initial step in a litigation which seeks as its goal a judgment affirming the award.'" (citing *Davenport v. Procter & Gamble Mfg. Co.*, 241 F.2d 511, 514 (2d Cir. 1957))).

DCS's Demand for Arbitration seeks $445,150.53.[12] Based on the claim DCS has pleaded in the O'Connor Arbitration, the Court concludes that DCS has clearly established that its federal claim under the FAA satisfies the requisite amount in controversy. Accordingly, the Court has diversity jurisdiction over DCS's Motion to Compel.[13]

### B.  Rule 12(b)(2) Motion: Personal Jurisdiction

O'Connor moves to dismiss this lawsuit pursuant to Rule 12(b)(2), arguing that DCS's Amended Complaint [Doc. # 18] fails to set forth specific facts that establish that the Court has personal jurisdiction over O'Connor.[14]

---

[12] *See* DCS's Demand for Arbitration, Exh. 1 to DCS's Supplemental Response [Doc. # 23].

[13] Neither party contests that the parties are diverse.

[14] O'Connor requests that the Court hold an evidentiary hearing on the issue of whether the Court has personal jurisdiction. DCS opposes this request. Because the Court finds that the pleadings, affidavits, and exhibits of record are sufficient to enable the Court to decide whether it has personal jurisdiction over O'Connor, the Court declines
(continued...)

A plaintiff bears the burden of establishing that a non-resident defendant has contacts with the forum state sufficient to invoke the jurisdiction of the Court. *Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 424 (5th Cir. 2005); *Mink v. AAAA Dev. LLC*, 190 F.3d 333, 335 (5th Cir. 1999). If there is no evidentiary hearing on a motion to dismiss for lack of personal jurisdiction, the party asserting jurisdiction is merely required to present facts sufficient to constitute a *prima facie* case of personal jurisdiction. *Freudensprung v. Offshore Technical Servs., Inc.*, 379 F.3d 327, 342–43 (5th Cir. 2004); *Cent. Freight Lines Inc. v. APA Transport Corp.*, 322 F.3d 376, 380 (5th Cir. 2003); *Alpine View Co. v. Atlas Copco A.B.*, 205 F.3d 208, 214 (5th Cir. 2000). The *prima facie* showing may be established by the pleadings, depositions, affidavits, or exhibits of record. *See Guidry v. U.S. Tobacco Co., Inc.*, 188 F.3d 619, 625 (5th Cir. 1999). A court must accept as true the plaintiff's uncontroverted allegations and resolve any factual conflicts in favor of the plaintiff. *Freudensprung*, 379 F.3d at 343; *Cent. Freight*, 322 F.3d at 380; *Alpine View*, 205 F.3d at 214. The law, however, does not require the court to credit conclusory allegations, even if uncontroverted. *Cent. Freight*, 322 F.3d at 380; *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 868–69 (5th Cir. 2001).

---

[14]   (...continued)
the request for an evidentiary hearing on this matter. *See Freudensprung*, 379 F.3d at 342–43.

A federal court in a diversity case may exercise jurisdiction over a nonresident corporate defendant only if permitted under state law. *Alpine View*, 205 F.3d at 214 (citing FED. R. CIV. P. 4(e)(1), 4(h)(1), 4(k)(1)). The Texas long-arm statute "authorizes the exercise of jurisdiction over nonresidents 'doing business' in Texas," and "the Texas Supreme Court has interpreted the 'doing business' requirement broadly, allowing the long-arm statute to reach as far as the federal Constitution permits." *Gundle Lining Constr. Corp. v. Adams County Asphalt, Inc.*, 85 F.3d 201, 204 (5th Cir. 1996); *Alpine View*, 205 F.3d at 214 (citing *Wilson v. Belin*, 20 F.3d 644, 647 & n.1 (5th Cir. 1994)); *Schlobohm v. Schapiro*, 784 S.W.2d 355, 357 (Tex. 1990); *see also Panda Brandywine*, 253 F.3d at 867; *Mink*, 190 F.3d at 335–36. Thus, the jurisdictional inquiry under the Texas long-arm statute collapses into a single due-process inquiry. *See Ruston Gas Turbines v. Donaldson Co.*, 9 F.3d 415, 418 (5th Cir. 1993); *Smirch v. Allied Shipyard, Inc.*, 164 F. Supp. 903, 906 (S.D. Tex. 2001).

As interpreted by the Supreme Court and the Fifth Circuit, a court's exercise of personal jurisdiction over a non-resident defendant comports with constitutional due process requirements when (1) the defendant "purposefully availed" itself of the benefits and protections of the forum state by establishing "minimum contacts" with that state, and (2) the exercise of personal jurisdiction does not offend traditional notions of "fair play and substantial justice." *Moncrief Oil Int'l, Inc. v. OAO*

*Gazprom*, 481 F.3d 309, 311 (5th Cir. 2007) (citing *Int'l Shoe Co. v. Wash.,* 326 U.S. 310, 316 (1945)); *Latshaw v. Johnston,* 167 F.3d 208, 211 (5th Cir. 1999)). Both prongs must be satisfied in order for a court to exercise personal jurisdiction over the defendant.

The "minimum contacts" prong is further subdivided into contacts that suffice to confer "specific jurisdiction" and those that give rise to "general jurisdiction." When a plaintiff asserts specific jurisdiction over a non-resident defendant, the court must determine (1) whether "the defendant purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there," and (2) whether "the controversy arises out of or is related to the defendant's contacts with the forum state." *Freudensprung*, 379 F.3d at 343; *Coats v. Penrod Drilling Corp.*, 5 F.3d 877, 884 (5th Cir. 1993) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)). In cases in which general jurisdiction is asserted, the court must determine whether the defendant has engaged in "continuous and systematic contacts" with the forum state. *Freudensprung*, 379 F.3d at 343.

The fact that a Texas plaintiff suffered some harm in Texas is insufficient to establish specific jurisdiction in this forum. *Revell v. Lidov*, 317 F.3d 467, 473 & n.41 (5th Cir. 2002); *Panda Brandywine*, 253 F.3d at 869–70. Rather, the focus of the specific jurisdiction inquiry is on "the relationship between the *defendant*, the forum,

and the litigation." *Freudensprung*, 379 F.3d at 343 (emphasis added).  Contacts that are "random," "fortuitous," or "attenuated" do not satisfy the minimum contacts requirement.  *Moncrief*, 481 F.3d at 312.

If the plaintiff makes a *prima facie* showing of minimum contacts, then the burden shifts to the defendant to show that the court's exercise of jurisdiction would not comply with "fair play" and "substantial justice."  *Freudensprung*, 379 F.3d at 343.  In making a fundamental fairness determination, a court must examine: (1) the burden on the defendant; (2) the forum state's interests; (3) the plaintiff's interest in convenient and effective relief; (4) the judicial system's interest in efficient resolution of controversies; and (5) the states' shared interest in furthering fundamental social policies.  *Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476, 487 (5th Cir. 2008); *Wein Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999).

DCS argues that O'Connor has purposefully availed itself of the benefits and protections of Texas law through its "multiple attempts at establishing minimum contacts with Texas in the underlying [O'Connor A]rbitration,"[15] and by asserting a counterclaim in that arbitration under the Texas Deceptive Trade Practice Act ("DTPA"), TEX. BUS. & COM. CODE § 17.41 *et seq*.[16]  O'Connor argues that the Court

---

[15]  DCS's Supplemental Response [Doc. # 23], at 7–8.

[16]  *See* O'Connor Chevrolet's Statement of Counterclaims and Affirmative Defenses,
(continued...)

lacks specific or general jurisdiction over it and that if the Court were to exercise personal jurisdiction it would violate O'Connor's due process rights and offend traditional notions of fair play and substantial justice.[17]

### 1. Specific Jurisdiction

Specific jurisdiction may be found when a foreign defendant has "'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King*, 471 U.S. at 472. DCS argues O'Connor's contacts meet this standard and that the Court has specific jurisdiction over O'Connor. Having examined all the evidence presented concerning O'Connor's contacts with Texas, the claims in issue, and the degree to which O'Connor has purposefully availed itself of the privileges of conducting activities in Texas, the Court finds that DCS has failed to establish that O'Connor's contacts with Texas are sufficient to invoke the Court's specific personal jurisdiction.

---

[16] (...continued)
Exh. I to DCS's Response [Doc. # 12].

[17] As a threshold matter, O'Connor argues that in determining whether the Court has personal jurisdiction, the Court should not consider the statements O'Connor filed in the underlying O'Connor Arbitration. Specifically, O'Connor objects that the "statements themselves are not facts and they are not verified." O'Connor's Second Supplemental Motion [Doc. # 20], ¶ 26. The Court rejects O'Connor's attempt to disavow its prior representations to the panel in the O'Connor Arbitration. O'Connor's statements are non-hearsay admissions by a party opponent. *See* FED. R. EVID. 801(d)(2).] Accordingly, the Court will consider O'Connor's filings in the O'Connor Arbitration in determining whether the Court has personal jurisdiction over O'Connor.

DCS directs the Court to the following evidence supporting minimum contacts: DCS solicited O'Connor's business from Texas; DCS requested O'Connor lodge its complaints about the computer system with a DCS representative in Texas; a DCS representatives in Texas provided O'Connor with instructions regarding the computer system; DCS's support services were located in Texas; and O'Connor sent payments to DCS in Texas.[18] The Court initially notes that most of the evidence DCS offers in support of personal jurisdiction focuses on DCS's actions, not O'Connor's conduct. Minimum contacts analysis, however, focuses *solely* on the activities and reasonable expectations of the *defendant*. *See Burger King*, 471 U.S. at 481–82 (emphasis added); *see also Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 790 (Tex. 2005).

O'Connor's pleadings in the O'Connor Arbitration assert that the Agreement was negotiated and signed in Texas.[19] The Court, however, is unable to determine from the record whether or not O'Connor was the party who negotiated the Agreement in Texas. The affidavit of Caryl O'Connor, president of O'Connor Chevrolet, Inc., suggests O'Connor did not engage in the negotiations or execute the Agreement in Texas. Caryl O'Connor states that the Agreement was assigned from Bob O'Connor

---

[18]   DCS's Amended Complaint [Doc. # 18], at 6.

[19]   O'Connor Chevrolet's Response to DCS's Motion for Partial Summary Judgment, Exh. 3 to DCS's Amended Answer [Doc. # 18], at 11.

Ford, Inc., a separate corporation, to O'Connor.[20]  Thus, the place of negotiation and signing does not factually support personal jurisdiction over O'Connor.

Assuming *arguendo* for purposes of the pending motion that it was O'Connor that negotiated and signed the Agreement in Texas, DCS nevertheless has not shown minimum contacts necessary to support specific jurisdiction. *See generally Stuart v. Spademan*, 772 F.2d 1185, 1193 (5th Cir. 1985) ("We stress that [Defendant's] contract with the Texas plaintiffs does not alone establish the sufficient minimum contacts with Texas.  Instead we look to the factors of prior negotiations, contemplated future consequences, terms of the contract, and the parties' actual course of dealing to determine whether [Defendant] purposefully established minimum contacts with the forum."). "The Supreme Court has rejected a formalistic rendering of minimum contacts, opting instead to look at the degree that a nonresident defendant has reached out and availed himself of the foreign venue." *Religious Tech. Center v. Liebreich*, 339 F.3d 369, 375 (5th Cir. 2003).  The Agreement's choice-of-law provision specifies that Michigan law governs the Agreement. *See Burger King*, 471 U.S. at 482 (holding that choice-of-law provisions should not be ignored in

---

[20] Affidavit of Caryl S. O'Connor, Exh. A to O'Connor's First Supplemental Motion [Doc. # 10], ¶ 8 ("Bob O'Connor Ford, Inc. assigned the Ford Dealer Computer Services, Inc. Contract to O'Connor Chevrolet.  The dealer principal of Bob O'Connor Ford, Inc. was my husband.  The assignment from Bob O'Connor Ford, Inc. to O'Connor Chevrolet, Inc. took place in Illinois.").

considering whether a defendant has purposely invoked the benefits and protections of a state's laws); *Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773, 778 (5th Cir. 1986) ("Although the contractual relationship between [a Texas plaintiff] and [an Oklahoma defendant] may have been cemented in Texas, the significance of this fact is diminished by the contract provision specifying that Oklahoma law would govern the agreement.").[21] Furthermore, no subsequent events relating to the Agreement took place in Texas. The affidavit of Caryl O'Connor states without contradiction in the record that the Agreement was assigned from Bob O'Connor Ford, Inc. to O'Connor in Illinois[22] and that O'Connor and DCS executed each of the numerous amendments to the Agreement in Illinois.[23] Moreover, the Agreement contemplated all material performance taking place in Illinois, where DCS installed and maintained the dealership computer system. *See id.* ("Our conclusion [that defendant's limited

---

[21] In *Holt*, the defendant's contacts with Texas were that the defendant entered a contract with a Texas corporation, sent a final joint operating agreement from Oklahoma to Texas, sent three checks from Oklahoma to Texas in partial performance of its contractual obligations, and engaged in extensive telephonic and written communications with the Texas plaintiff. *Holt*, 801 F.2d at 777–78.

[22] Affidavit of Caryl S. O'Connor, Exh. A to O'Connor's First Supplemental Motion [Doc. # 10], ¶ 8 ("Bob O'Connor Ford, Inc. assigned the Ford Dealer Computer Services, Inc. Contract to O'Connor Chevrolet. The dealer principal of Bob O'Connor Ford, Inc. was my husband. The assignment from Bob O'Connor Ford, Inc. to O'Connor Chevrolet, Inc. took place in Illinois.").

[23] *Id.*, ¶ 9 ("O'Connor Chevrolet signed many amendments to the [Agreement]. Each time it signed one of those amendments, the execution took place in the state of Illinois. These amendments were not signed by O'Connor in the state of Texas.").

contacts were insufficient to support an exercise of specific jurisdiction] is further bolstered by the fact that performance of the contract was centered in Oklahoma rather than Texas").

DCS also argues that O'Connor's sending payments to Texas establishes minimum contacts. This fact alone, or in conjunction with the negotiation and signing of the Agreement in Texas, is insufficient to establish minimum contacts under the circumstances. *See Holt*, 801 F.2d at 778 ("Given that the material performance occurred in Oklahoma, the fact that [defendant] mailed payments to Texas does not weigh heavily in our determination."); *see also Freudensprung*, 379 F.3d at 344.

With respect to DCS's contentions that its representatives in Texas were to be contacted about problems and servicing of the computer system, there is no evidence in the record of O'Connor having used these services. Under the record presented, O'Connor had very limited contacts with Texas. As discussed in the following section, O'Connor did not have contacts with Texas apart from those arising from the Agreement. The Court, therefore, finds that O'Connor should not have "reasonably anticipate[d] being haled into court" in Texas. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 296 (1980).

DCS also argues that O'Connor's assertion of a Texas DTPA counterclaim in the O'Connor Arbitration is sufficient to establish O'Connor's minimum contacts with

this state.  At the initial pretrial conference, the Court specifically requested that DCS direct the Court to authority holding that a party's attempt to file a claim invoking one state's laws in an arbitration filed by the opponent is sufficient to establish the necessary minimum contact for specific jurisdiction in the courts of that forum.  In response, DCS directs the Court to *Michiana*, 168 S.W.3d 777,[24] for the proposition that "by invoking the benefits and protections of a forum's laws, a nonresident consents to suit there."  This quotation from *Michiana*, however, merely echoes the general standard of purposeful availment.  It does not speak specifically to the situation in the case at bar where O'Connor defensively asserted a state law *counterclaim* in an *arbitration*, as opposed to before a Texas court.  The *Michiana* case does not support DCS's position.  DCS does not cite to other authority supporting its position and the Court independently has discovered no such authority. Accordingly, the Court concludes that DCS has not established the minimum contacts needed for the Court to exercise specific jurisdiction over O'Connor.

---

[24]   In *Michiana*, Holten, a Texas resident, purchased a recreational vehicle from Michiana, a store that only did business in Indiana.  Holten initiated the sale by calling Michiana in Indiana, sent payment to Indiana, and paid for delivery from Indiana.  Holten later brought a suit in Texas based on Michiana's alleged misrepresentations in a telephone call with Holten.  The Court held that Michiana's contacts with Texas were insufficient to support specific personal jurisdiction.

## 2. General Jurisdiction

DCS does not explicitly argue that the Court has "general" personal jurisdiction over O'Connor. However, to the extent that DCS's contentions permit such construction, the Court has independently examined the evidence submitted and finds that O'Connor's direct contacts with Texas over the relevant period are insufficient to establish general jurisdiction. O'Connor is an Illinois corporation; its principal place of business is in Alsip, Illinois; it does not conduct business in Texas; it does not solicit business in Texas; it does not send advertisements or other correspondence to consumers in Texas; and its website does not direct advertising to Texas.[25] Apart from the Agreement with DCS, O'Connor does not have any contacts with Texas. Accordingly, the Court lacks a basis to exercise general jurisdiction over O'Connor. *See Alpine View*, 205 F.3d at 217 (contacts unrelated to the litigation must be substantial, continuous, and systematic to support a finding of general jurisdiction).

## 3. "Fair Play and Substantial Justice" Considerations

Because DCS has failed to make a *prima facie* showing of minimum contacts supporting either specific or general jurisdiction, the Court need not address whether the Court's exercise of jurisdiction would comply with traditional notions of fair play and substantial justice.

---

[25] Affidavit of Caryl S. O'Connor, Exh. A to O'Connor's First Supplemental Motion [Doc. # 10], at 2.

### III.     CONCLUSION

The Court concludes that O'Connor's Motion [Doc. # 5], as supplemented [Docs. # 10, # 20, # 22], should be granted for lack of personal jurisdiction. Because the Court concludes that O'Connor's Motion should be granted for lack of personal jurisdiction, the Court does not address O'Connor's other theories for dismissal or transfer. For the foregoing reasons, it is hereby

**ORDERED** that O'Connor's Motion [Doc. # 5], as supplemented [Docs. # 10, # 20, # 22] is **GRANTED**, and this case is **DISMISSED**.

The Court will enter a separate Order of Dismissal.

**SIGNED** at Houston, Texas, this 17th day of **June, 2009**.

_____
Nancy F. Atlas
United States District Judge